**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | | |
|---|---|---|
| NOBLE SUPPLY & LOGISTICS, LLC | ) | |
| *One Marina Park Drive, Suite 220* | ) | |
| *Boston, Massachusetts 02210* | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-01476 |
| | ) | |
| CAROLINE HURD | ) | |
| *3069 Yorkstone Court,* | ) | |
| *Leland, North Carolina 28451* | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**VERIFIED COMPLAINT**
**IN SUPPORT OF PLAINTIFF'S APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTIVE RELIEF**

Plaintiff, Noble Supply & Logistics, LLC ("Noble" or "Plaintiff"), by and through undersigned counsel, sets forth the following as its Verified Complaint against Defendant Caroline Hurd ("Defendant" or "Hurd").

**NATURE OF THE ACTION**

1.     While employed by and receiving pay from Noble as the National Fire/EMS Sales Representative, Hurd surreptitiously removed a multitude of documents containing or comprising confidential proprietary information and trade secrets, as well as confidential third-party information to her personal possession. Hurd then left Noble's employ without returning the valuable confidential information, and began working for Noble's competitor, non-party Safeware Inc. ("Safeware"), providing the same or similar services that she provided Noble. Hurd has wrongfully used, disclosed, or inevitably will disclose Noble's proprietary confidential

information and trade secrets for the benefit of Safeware in violation of her contractual obligations to Noble.  Noble seeks relief from this Court for this willful attack on its business.

2.      This is a civil action for damages and injunctive relief arising out of Defendant's violations of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831 *et seq.*; the Delaware Uniform Trade Secrets Act, 6 DEL. C. § 2001 *et seq*.; breach of contract; breach of fiduciary duty; and conversion.

## THE PARTIES

3.      Noble is a Massachusetts corporation with its principal place of business in Boston, Massachusetts.

4.      On information and belief, Hurd is a United States citizen who resides in 3069 Yorkstone Court, Leland, North Carolina, 28451.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this matter pursuant 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000.

6.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Noble asserts claims for misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*  This Court has supplemental or pendant jurisdiction over Noble's remaining claims pursuant to 28 U.S.C. § 1367 because such claims are so related to Noble's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

7.      This Court has personal jurisdiction over Hurd because Hurd worked for Noble for years out of Noble's Stevensville, Maryland location, which office she often traveled to Maryland

2

to visit, work at, and perform services for clients as required in the ordinary course of her employment.  Hurd regularly traveled to the Stevensville, Maryland office for business purposes both as an employee of Noble and as an employee of Noble's predecessor-in-interest, Federal Resources Supply Company ("Federal Resources").   In addition, as a condition of Hurd's employment with Federal Resources, Hurd and Federal Resources executed a Restrictive Covenant Agreement (the "Agreement," Exhibit A) dated December 21, 2020, in which the parties agreed that "Each party, for itself and its successors and assigns, (i) hereby irrevocably consents to the exclusive jurisdiction of . . . the United States District Court for the District of Maryland, Northern Division." (Ex. A ¶ 18.)

8.       Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to this Complaint occurred in this district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

### A. Background on Noble and its Confidential Information and Trade Secrets

9.       Noble is an industry leading global provider of integrated supply, procurement, and logistics solutions to the U.S. government and private sectors.  Noble provides services to all branches of the United States military, law enforcement and emergency response agencies, other government organizations, and the defense industry.

10.      Because Noble's customers are located throughout the United States and around the world, Noble provides services, and competes to do so, on a global scale.  (*See* Ex. A ¶ 9 ("Employee acknowledges (x) that the business of the Company will be conducted throughout the world; (y) notwithstanding the state of organization or principal office of the Company, or any of its respective employees (including Employee), it is expected that the Company will have business activities and have valuable business relationships within its industry throughout the world; and

3

(z) as part of Employee's responsibilities, Employee may be traveling throughout the world and in jurisdictions where the Company conducts business during Employee's employment in furtherance of the Company's business and its relationships.").)

11.     Noble supplies its clients with everything from industrial products, construction equipment, office furniture and supplies, personal protective equipment, military and law enforcement gear, appliances, electronics, to food service and janitorial supplies.

12.     Because of the competitiveness of the market, Noble depends on its ability to maintain the secrecy of its confidential and proprietary information, including pricing information, cost information, forecasts, sales performance data, formulas, sales and market strategies, proposals, pricing, bids and quotes to customers and prospective customers, internal costs, customer and reference lists and private information about the people and companies with whom Noble does business.

13.     Noble's confidential, proprietary and trade secret information is not available to the public and is not generally known in the supply, procurement, and logistics industry.  Noble expended significant effort and expense in developing its confidential, proprietary and trade secret information.

14.     The value of Noble's confidential, proprietary and trade secret information lies in its exclusive use by Noble and its employees.

15.     Noble would lose its competitive advantage if one of its competitors obtained its confidential, proprietary and trade secret information.  For example, a competitor, like Safeware, could use Noble's confidential cost and pricing information to underbid Noble to sell its products to Noble's customers.

16.     As such, Noble goes to great lengths to protect its confidential, proprietary and trade secret information.  For example, Noble requires key employees (including Hurd, as discussed below) to sign confidentiality agreements.

17.     To further safeguard its property and information, Noble uses password protection to limit access to sensitive information, requires all employees to review and acknowledge its information security policy, and provides access to financial and bid proposal information only on a need-to-know basis.

18.     Safeware is a direct competitor of Noble.  Like Noble, Safeware is a national provider of supply and procurement services.  Safeware focuses on providing its private and government customers with emergency preparedness expertise, protective safety equipment, fire and rescue protection, tactical safety, PPE, and industrial clothing.

**B.  Defendant's Employment by Noble**

19.     Hurd was a key employee of Noble from May 2009 to March 2023.  As the National Fire/EMS Sales Representative, Hurd's job duties included identifying and developing sales opportunities in the Hazmat and first responder community.  In addition to setting pricing and developing requirements with vendors in all of the Noble markets, she was responsible for all aspects of the sales cycle to include bid responses, margin setting, grant funding requests, establishing and maintaining customer relationships and customer specific contracts. Hurd also had a key role on selling service and training to the same customer base.

20.     Hurd came to Noble as a result of Noble's acquisition of Federal Resources, completed in October 2021, which was a direct competitor of Noble, providing similar supply, procurement, and logistics services to government clients in the same market, and for which Hurd performed substantially the same job duties.

21.     As a condition of Hurd's employment with Federal Resources, Hurd entered into a Restrictive Covenant Agreement (the "Agreement", <u>Exhibit A</u>) dated December 21, 2020.  (Ex. A ¶ 18.)  As the successor-in-interest to Federal Resources, Noble now owns all of Federal Resources goodwill and assets, including the Agreement.  (*See* Ex. A ¶ 17 ("This Agreement is intended to bind and inure to the benefit of and be enforceable by Employee, the Company and their respective heirs, successors and assigns, except that Employee may not assign her rights or delegate her duties or obligations hereunder without the prior written consent of the Company.").)

22.     In her role at Noble, Hurd received, had access to, and in some cases developed or directed the development of Noble's proprietary and confidential information, including (1) pricing and logistical information relating to Noble's management of its government contracts; (2) margin and profitability information; (3) potential opportunities for Noble's business, and strategies to pursue those opportunities; (4) marketing strategies; (5) advertising objectives, plans, and timelines; and (6) other business and sales strategies.  Possession of such information would provide a competitor an enormous unfair advantage by giving that competitor all the information it needs to effectively undercut Noble in the marketplace.

23.     As part of the Agreement, Hurd entered into certain non-disclosure and non-use of confidential information covenants (the "Non-Disclosure Covenants").  (Ex. A ¶ 4.)

24.     Hurd promised that "during [her] employment with the Company and at any time thereafter . . . . (a) [Hurd] shall keep strictly confidential and not disclose to any person not employed by the Company any Confidential Information; and (b) [Hurd] shall not use for Employee or for any other person or entity any Confidential Information . . . ."  (Ex. A ¶ 4(a).)

25.     Hurd further promised that she would "deliver to the Company at the termination of employment . . . all copies and embodiments, in whatever form, of memoranda, notes, plans,

records, reports and other documents (and copies thereof), relating to the business of the Company

(including, without limitation, all Confidential Information or Intellectual Property) that Employee

then possesses or has under her or her control." (Ex. A ¶ 4(a).)

26.     Additionally, Hurd agreed that she "understands that the Company will receive

from third parties confidential or proprietary information ('THIRD-PARTY INFORMATION') subject

to a duty on the Company or any Affiliate's part to maintain the confidentiality of such information

and to use it only for certain limited purposes." Further, Hurd agreed that she "will hold Third-

Party Information in the strictest confidence and will not disclose to anyone (other than personnel

of the Company who need to know such information in connection with their work for the

Company) or use, except in connection with her or her work for the Company or any Affiliate,

Third-Party Information unless expressly authorized by the Company in writing." (Ex. A ¶ 4(b).)

27.     Hurd acknowledged "that the continued success of the Company depends upon the

use and protection of the Company's Confidential Information." (Ex. A ¶ 4(a).)

28.     The Agreement broadly defined Confidential Information as

all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential" and now existing or developed in the future), in any form or medium, that relates to or results from the business, historical or projected financial results, products, services or research or development of the Company or any of its Affiliates or their respective suppliers, distributors, customers, independent contractors or other business relations. Confidential Information will be interpreted as broadly as possible to include **all information of any sort (whether merely remembered or embodied in a tangible or intangible form) that is (I) related to the Company's or its Affiliates' (including their predecessors' prior to being acquired by the Company) current or potential business and (II) is not generally or publicly known**. Confidential Information includes, but is not limited to, the following: (i) **internal business information** (including **historical and projected financial information and budgets and information relating to strategic and staffing plans and practices, including plans regarding planned and potential sales, financial and business plans, training, marketing, promotional and sales plans and practices, cost, rate and pricing structures and prices and terms**, risk management practices, negotiation strategies and practices, accounting and business methods, acquisition

opportunities, development, transition and transformation plans, locations of sales representatives, customer service, integration processes and requirements and costs of providing service, support and equipment); (ii) **identities of, individual requirements of, specific contractual arrangements with, and information about, the Company's** or any of its Affiliates' current, former or prospective employees (including personnel files and other information), **suppliers, distributors, customers**, independent contractors or other business relations and their confidential information; (iii) **Trade Secrets**, technology, know-how, compilations of data and analyses, techniques, systems, formulae, research, records, reports, manuals, flow charts, documentation, models, data and data bases relating thereto; . . .

(Ex. A ¶ 11(c) (emphasis added).)

29.     The Agreement defined Trade Secrets as

the Company's and its Affiliates' information that the Company or its Affiliates has made reasonable efforts to keep confidential and that derive independent economic value, actual or potential, from not being generally known or reasonably ascertainable to the public or to other persons who can obtain economic value from its disclosure or use.

(Ex. A ¶ 11(d).)

30.     Hurd also entered into certain non-competition covenants (the "Non-Competition Covenants").  (Ex. A ¶ 6.)

31.     Hurd promised that, "during the term of [her] employment and for a term of one (1) year, beginning on the last day of the Employee's employment with the Company . . . (the 'RESTRICTED PERIOD'), [Hurd] agrees and covenants not to engage in Prohibited Activity (as defined below) by him or herself or through any Person, anywhere in the territory in which Employee performed services for the Company."   (Ex. A ¶ 6.)

32.     Hurd agreed and acknowledged that "the territory in which Employee performed services for the Company" consisted of "the United States of America, the Mid-Atlantic (including New York, Pennsylvania, New Jersey, Delaware, West Virginia, Virginia, Maryland, D.C., and

North Carolina) and within two hundred and fifty (250) miles of the Company office (the 'RESTRICTED TERRITORY')."  (Ex. A ¶ 6.)

33.     The Agreement defined Prohibited Activity as

activity, within the Restricted Territory, in which the Employee **provides the same or similar services as those that Employee provided the Compan**y in the course of Employee's employment, including but not limited to United States Department of Defense and Federal Government Maintenance, Repair, and Operations services, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, contractor, agent, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity to an entity engaged in the same or similar business as the Company. Prohibited Activity also includes **activity that requires or inevitably will require disclosure of Trade Secrets, proprietary information, or Confidential Information**. During the Restricted Period, **Employee further agrees not to provide any services competitive to the Company to any Person who is an awardee of the same multiple award contracts as the Company** at that time with respect to any such contract that Employee provided any services for while employed by the Company.

(Ex. A ¶ 6 (emphasis added).)

34.     Hurd also entered into certain non-solicitation covenants (the "Non-Solicitation Covenants").  (Ex. A ¶ 5.)

35.     Hurd promised that "during [her] employment with the Company and for a period thereafter of one (1) year (the 'PROTECTION PERIOD')" Hurd would not, on her "own behalf or through another Person," among other things

(iii) induce or attempt to induce any Customer, as defined below, supplier, licensee or other business relation of the Company or its Affiliates to cease doing business with the Company or its Affiliates, reduce the business that it does with the Company or its Affiliates, or in any way interfere with the relationship between any such Customer, supplier, licensee or business relation and the Company (including, without limitation, making any negative statements or communications concerning the Company, except as allowed under state or federal law); or

(iv) solicit, participate in soliciting, sell products or services the same or substantially similar to those offered by the Company, or accept business the same or similar to that engaged in by the Company from any Customer.

(Ex. A ¶ 5.)

9

36.     The Agreement defines "Customer" as

any and all customers and accounts of the Company with whom the Company has a contract or engagement at the conclusion of Employee's employment, or for whom Company completed an engagement, provided services, or sold goods to within the twenty-four (24) months preceding the conclusion of Employee's employment, and: (x) for which the Employee had direct communications or provided services or sold goods on behalf of Company in the twenty-four (24) months preceding the end of Employee's employment; or (y) about whom the Employee obtained Trade Secrets or Confidential Information.

(Ex. A ¶ 5.)

37.     Hurd also acknowledged that "[b]ecause Employee's services are unique and because Employee has access to Confidential Information and Trade Secrets . . . in the event of the breach or a threatened breach" by Hurd of the Non-Disclosure Covenants, Non-Solicitation Covenants, or Non-Competition Covenants, "the Company would suffer irreparable harm and money damages would be an inadequate remedy therefor . . . the Company or its Affiliates shall be entitled to specific performance and injunctive or other equitable relief . . . to enforce or prevent any violations of the provisions hereof."  (Ex. A ¶ 8.)

38.     Further, Hurd agreed that "(i) the Restricted Period shall be tolled until such breach or violation has been duly cured, and (ii) the Company shall be entitled to recover from Employee all profit, remuneration or other consideration that Employee gains from breaching the covenant and damages that the Company suffers as a result of the breach."  (Ex. A ¶ 8.)

39.     Hurd also agreed to a Delaware choice of law provision.  (Ex. A ¶ 18 ("All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and any exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.").)

10

C. **Defendant's Conversion and Misappropriation of Confidential Information and Trade Secrets**

40.     During the course of Hurd's employment with Federal Resources and Noble, Hurd regularly misappropriated confidential, proprietary and trade secret information.  The wrongfully taken information consisted of (1) confidential bid documents, (2) internal sales information, and (3) client documents.

41.     As early as December 2021, Defendant began forwarding confidential, proprietary and trade secret information containing documents from the company's bids from her work email address to her personal email account.  That month, she forwarded herself an email attaching a Federal Resources bid for a contract with Anderson County Tennessee.

42.     Hurd had no business or otherwise legitimate purpose for forwarding such confidential, proprietary and trade secret information to her personal email account.

43.     Throughout the course of her employment, Hurd continued forwarding herself bid documents including the company's bids for municipal contracts with:

     a.   Cape May, New Jersey in December 2022;

     b.   Nassau County, New York in July 2022;

     c.   New York City in January 2023;

     d.   Myrtle Beach in January 2023; and

     e.   Jacksonville, Florida in March 2023.

44.     One such bid document Hurd forwarded herself was conspicuously labeled "**FORMAL SEALED BID PROPOSAL**" at the top of the first page in the document in bold, all-caps font that was several times larger than the majority of the text on the page.  Accordingly, Hurd knew that the document she was converting to her personal possession was protected confidential information.

45.     Hurd also forwarded herself internal sales information that constituted confidential, proprietary and trade secret information.  On March 14, 2023, the same day that she sent out her resignation letter, Ms. Hurd emailed a copy of an excel spreadsheet documenting her sales commissions to her personal email address.

46.     Other notable internal sales information that Hurd forwarded herself include:

    a.     A map depicting her sales territory in December 2022;

    b.     A December 2022 "Sales Territory Planning" document that evaluated Noble's sales performance in 2022, described specific sales goals, tactical plans for achieving those goals, and future customer targets for 2023, and contained other sensitive information; and

    c.     An end of week report, sent the week Hurd sent her resignation letter, capturing her meeting notes, vendor issues, new opportunities identified and their values, booked opportunities and their values, major bids/proposals she was working on, and noteworthy losses. Notably, while Hurd normally forwarded Noble's confidential information directly to her personal email account, she blind copied herself on this end of week report, which was sent to another Noble employee.

47.     Lastly, Hurd also sent several documents regarding clients that contain sensitive information about the Company's prices, as well as agreements with clients. By way of example, Hurd forwarded herself purchase orders for several customers including:

    a.     Prince William County, Virginia;

    b.     D.C. Fire and Emergency Medical Services;

    c.     IKEA US Retail LLC; and

      d.  Montgomery County, Pennsylvania.

48.    Hurd had no legitimate business reason to send any of the bid documents, internal sales information, or client documents to her personal e-mail account and was not authorized to send these files to that account.

49.    The bid documents, internal sales information, and client documents described above constitute confidential, proprietary and/or trade secret information. Noble kept these files and the information contained in them confidential and not available to competitors or the public in general.

50.    It is particularly important to Noble that this sort of information does not fall into the hands of competitors, as these detailed financial records and projections would give Safeware (or any competitor) a roadmap for exactly how to undermine Noble's position in the market.  These files also contained Noble operational and marketing plans.

51.    As a high-level Noble employee, Hurd knew the confidential nature of this information as well as its value to Noble and any competitor like Safeware, who was competing to overtake it in the market.

52.    On March 14, 2023, Hurd announced that she would be resigning from Noble.

53.    Shortly after leaving Noble, Hurd began working for Safeware.  On information and belief, Hurd works for Safeware in a senior account executive role that is the same as or nearly identical to the position she held at Noble, in which she provides the same or similar services as those she provided Noble to Safeware, and sells products or services that are the same or substantially similar to those offered by Noble, in the same sales territory that Noble competes with Safeware to sell those products and services.

54.     On information and belief, at the time Hurd e-mailed herself this information, she was already planning to leave Noble for Safeware, and she sent this proprietary information to her personal email account so that she could continue using that information on behalf of Safeware.

55.     On information and belief, Hurd used her possession of these files and the information in them in her negotiations with Safeware to obtain a more senior position at Safeware and a large pay increase for herself.

56.     On information and belief, Hurd's continued employment with Safeware will inevitably result in the disclosure of Noble proprietary, confidential, and/or trade secret information, given the similarities between Hurd's work for Noble and Safeware and the fact that Noble and Safeware are direct competitors.

57.     The taking of this information without authorization deprived Noble of exclusive possession and control of its rightfully owned information and significantly diminished its value to Noble.

58.     Because of the critical nature of the information Hurd has misappropriated, Hurd's actions have the potential to damage Noble's business operations permanently and irreparably, as Hurd contractually agreed.  (Ex. A ¶ 8.)

59.     Noble is entitled to preliminary and permanent injunctive relief enjoining Hurd from, among other things, continuing to use and/or disclose Noble's confidential, proprietary and trade secret information.

### CAUSES OF ACTION

### COUNT I – MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT OF 2016

60.     Noble incorporates Paragraphs 1 through 59 by reference.

61.     Noble possesses highly unique and valuable information, including, without limitation, its cost and pricing information, historical sales and purchasing trends, operations processes, revenue and cost forecasts, sales and product development strategies, including, but not limited to, the information surreptitiously taken without authorization by Hurd as described above (the "Trade Secret Information").

62.     Noble's Trade Secret Information provides Noble a competitive business advantage over others in its industry who do not know or use such information.

63.     Noble has a nationwide presence, with sales, vendors, and customers in almost every state.  Thus, the Trade Secret Information Hurd misappropriated is information that pertains to, and is used in, interstate commerce.

64.     This information has independent economic value because it is not generally known to and is not readily ascertainable by proper means by persons other than Noble who could obtain economic value from its disclosure or use.

65.     Noble has taken steps to maintain the secrecy of its Trade Secret Information by maintaining the information on a password protected computer system, limiting access to such information to personnel who require same for Noble business, and requiring employees, including Hurd, to maintain the secrecy and confidentiality of the information as a term and condition of their employment with Noble.

66.     The Trade Secret Information Hurd misappropriated was developed and maintained for exclusive use by Noble and its employees and not for competition against Noble.

67.     The Trade Secret Information Hurd misappropriated is highly valuable and is not known to Noble's competitors.  The information has allowed and/or will allow Hurd to start targeting Noble's customers immediately, and to immediately implement changes to Safeware's

operations and supply processes that will allow them to increase profit and unfairly compete with Noble.

68.     Hurd's unlawful misappropriation of Noble's Trade Secret Information has caused and will continue to cause Noble damage.

69.     Hurd's actions in misappropriating Noble's Trade Secret Information for her own gain were willful, wanton, and malicious, and were taken in bad faith and with reckless disregard for Noble's rights.

70.     Hurd's actions have caused and will continue to cause damages in an amount to be determined at trial, but also have caused and will continue to cause Noble irreparable harm if not preliminarily and permanently enjoined.  The irreparable harm to Noble consists of ongoing damage to its competitive position in the marketplace, damage to its business reputation, loss of the exclusive use of its carefully developed trade secrets, none of which can be compensated by money damages.

71.     Noble has no adequate remedy at law because Hurd's actions are ongoing and are affecting its goodwill, reputation and ability to compete in a highly competitive marketplace.

**COUNT II – MISAPPROPRIATION OF TRADE SECRETS UNDER THE DELAWARE UNIFORM TRADE SECRETS ACT**

72.     Noble incorporates Paragraphs 1 through 71 by reference.

73.     Noble possesses highly unique and valuable information, including, without limitation, its cost and pricing information, historical sales and purchasing trends, operations processes, revenue and cost forecasts, sales and product development strategies, including, but not limited to, the information surreptitiously taken without authorization by Hurd as described above (the "Trade Secret Information").

74.     Noble's Trade Secret Information provides Noble a competitive business advantage over others in its industry who do not know or use such information.

75.     This information has independent economic value because it is not generally known to and is not readily ascertainable by proper means by persons other than Noble who could obtain economic value from its disclosure or use.

76.     Noble has taken steps to maintain the secrecy of its Trade Secret Information by maintaining the information on a password protected computer system, limiting access to such information to personnel who require same for Noble business, and requiring employees, including Hurd, to maintain the secrecy and confidentiality of the information as a term and condition of their employment with Noble.

77.     The Trade Secret Information Hurd misappropriated was developed and maintained for exclusive use by Noble and its employees and not for competition against Noble.

78.     The Trade Secret Information Hurd misappropriated is highly valuable and is not known to Noble's competitors.   The information has allowed and/or will allow Hurd to start targeting Noble's customers immediately, and to immediately implement changes to Safeware's operations and supply processes that will allow them to increase profit and unfairly compete with Noble.

79.     Hurd's unlawful misappropriation of Noble's Trade Secret Information has caused and will continue to cause Noble damage.

80.     Hurd's actions in misappropriating Noble's Trade Secret Information for her own gain were willful, wanton, and malicious, and were taken in bad faith and with reckless disregard for Noble's rights.

81.     Hurd's actions have caused and will continue to cause damages in an amount to be determined at trial, but also have caused and will continue to cause Noble irreparable harm if not preliminarily and permanently enjoined.   The irreparable harm to Noble consists of ongoing damage to its competitive position in the marketplace, damage to its business reputation, loss of the exclusive use of its carefully developed trade secrets, none of which can be compensated by money damages.

82.     Noble has no adequate remedy at law because Hurd's actions are ongoing and are affecting its goodwill, reputation and ability to compete in a highly competitive marketplace.

### COUNT III – BREACH OF CONTRACT

**(Non-Disclosure Covenants)**

83.     Noble incorporates Paragraphs 1 through 82 by reference.

84.     The Agreement (Exhibit A) is an enforceable and binding contract.

85.     Under the Non-Disclosure Covenants of the Agreement, Hurd was obligated, *inter alia*, to (1) "keep strictly confidential and not disclose to any person not employed by the Company any Confidential Information," or Third-Party Information, (2) "not use for Employee or for any other person or entity any Confidential Information," or Third-Party Information, and (3) return all copies of Noble documents, including confidential information, in her possession or control.

86.     Noble performed its obligations under the Agreement.

87.     Through the acts described above, Hurd breached her obligations under the Agreement, including, without limitation, by the surreptitious removal of Noble's confidential and trade secret information and third-party information to her personal custody without authorization; the use and/or inevitable disclosure of Noble's confidential and trade secret information and third-party information for Safeware; the failure to surrender or return Noble's confidential information

without authorization; and engaging in activity that requires or inevitably will require disclosure of trade secrets, proprietary information, or Confidential Information.

88.    Noble has been damaged by Hurd's breaches.

## COUNT IV – BREACH OF CONTRACT

### (Non-Solicitation Covenants)

89.    Noble incorporates Paragraphs 1 through 88 by reference.

90.    The Agreement (Exhibit A) is an enforceable and binding contract.

91.    Under the Non-Solicitation Covenants of the Agreement, Hurd was prohibited, for a period of one year following termination of her employment with Noble, from, *inter alia*, (1) inducing any Customer to cease doing business with or reduce such business with Noble, and (2) soliciting, directly or indirectly, selling products or services the same or substantially similar to those offered by Noble, or accepting business from any Customer.

92.    Noble performed its obligations under the Agreement.

93.    Through the acts described above, Hurd breached her obligations under the Agreement, including, without limitation, by selling products or services that are the same or substantially similar to those offered by Noble.

94.    Noble has been damaged by Hurd's breaches.

## COUNT V – BREACH OF CONTRACT

### (Non-Competition Covenants)

95.    Noble incorporates Paragraphs 1 through 94 by reference.

96.    The Agreement (Exhibit A) is an enforceable and binding contract.

97.    Under the Non-Competition Covenants of the Agreement, Hurd was prohibited, for a period of one year following termination of her employment with Noble, from, *inter alia*, (1)

providing the same or similar services as those she provided Noble, and (2) engaging in activity that requires or inevitably will require disclosure of "Trade Secrets, proprietary information, or Confidential Information."

98.     Noble performed its obligations under the Agreement.

99.     Through the acts described above, Hurd breached her obligations under the Agreement, including, without limitation, by providing the same or similar services to Safeware as those she provided Noble and engaging in activity that requires or inevitably will require disclosure of trade secrets, proprietary information, or Confidential Information.

100.    Noble has been damaged by Hurd's breaches.

## COUNT VI – BREACH OF FIDUCIARY DUTY

101.    Noble incorporates Paragraphs 1 through 100 by reference.

102.    As a high-level employee of Noble, Hurd owed Noble fiduciary duties, including the duty of loyalty.

103.    By engaging and continuing to engage in the activities described herein, including by promoting her own interests over those of Noble; converting Noble's confidential, proprietary, trade secret and third-party information, Hurd has intentionally, materially, and directly violated the fiduciary duties she owed to Noble.

104.    Defendant's actions have proximately caused, and continue to proximately cause, damages and harm to Noble.

## COUNT VII - CONVERSION

105.    Noble incorporates Paragraphs 1 through 104 by reference.

106.    At all times relevant to this Complaint, Noble (and its predecessor-in-interest) was the true owner of its proprietary and confidential information and trade secrets.

107.    At all times relevant to this Complaint, Noble (and its predecessor-in-interest) had a right to exclusive possession of its proprietary and confidential information and trade secrets.

108.    Hurd committed a distinct act of ownership and control over the information without authorization and in contravention of Noble's right to possess it.

109.    Defendant thereby wrongfully converted Noble's property, including but not limited to the proprietary and confidential information and trade secrets described above, for Hurd's own use and enjoyment, and the use of Hurd's new employer, Safeware, thus depriving Noble of its property.  Hurd engaged in this activity with the intent to permanently deprive Noble of the use of its confidential and valuable property.

110.    Hurd's unauthorized assumption and exercise of rights of ownership have been to the exclusion of the ownership rights of Noble.

111.    Hurd's conduct is wrongful, willful, and malicious.  Accordingly, Noble is entitled to recover from Hurd punitive damages, in addition to its actual damages and attorney's fees, pursuant to the applicable statutes.

112.    Hurd's conversion has caused and threatens to continue to cause Noble irreparable injury, for which adequate redress may not be had at law.  Thus, for such conversion, Noble is entitled to injunctive relief, including a permanent injunction.

## **REQUEST FOR INJUNCTIVE RELIEF**

113.    Noble realleges and incorporates herein by reference all preceding paragraphs as if fully alleged herein.

114.    By virtue of the allegations in this Complaint, Noble has demonstrated a likelihood of success on the merits and that a balancing of the equities favors the issuance of an injunction against Hurd.

115.    Unless Hurd is enjoined from engaging in additional misconduct, Noble will be irreparably harmed in the marketplace by having its confidential information improperly, unlawfully, and competitively used against it.

116.    Such misconduct by Hurd will result in substantial loss, which is unascertainable at this point in time, and future economic loss which presently is incalculable.

117.    Noble has no adequate remedy at law for Hurd's misconduct, as money damages are not adequate to compensate for the ongoing harm caused by such misconduct.

118.    Hurd has contractually agreed and acknowledged in the Agreement that "in addition and supplementary to other rights and remedies existing in its favor, [Noble] shall be entitled to specific performance and injunctive or other equitable relief from a court of competent jurisdiction in order to enforce or prevent any violations of the provisions hereof."  (Ex. A ¶ 8.)

119.    Noble has a clear legal right to the requested relief, and the balance of equities weighs heavily in Noble's favor.

120.    The public interest favors entry of an injunction to protect the legitimate business interests of parties who have substantial relationships with customers, and Hurd has contractually agreed and acknowledged in the Agreement that "the potential harm to the Company of the non-enforcement of any provision of [the Non-Disclosure Covenants, the Non-Solicitation Covenants, and Non-Competition Covenants,] outweighs any potential harm to Employee of its enforcement by injunction or otherwise."  (Ex. A ¶ 9.)

## **PRAYER FOR RELIEF**

WHEREFORE, based upon the foregoing, Noble respectfully seeks the following relief from the Court:

A.  That Noble have and recover compensatory and punitive damages from Defendant in an amount in excess of $75,000.00, plus pre-judgment and post-judgment interest;

B.  That the Court disgorge all amounts wrongfully attained by Defendant as a result of her misconduct, plus pre-judgment and post-judgment interest;

C.  That the Court enter an Order temporarily, preliminarily, and permanently enjoining Defendant as follows:

   1.  Prohibiting Hurd from working for Safeware for the duration of the Restricted Period;

   2.  Requiring Hurd to immediately make available for forensic imaging and examination by an independent third-party consultant any personal computer, personal cell phone, and any other devices or electronic accounts (such as e-mail accounts or cloud-based storage accounts) in Hurd's possession, custody, or control, or to which Hurd has access, which presently contain or have previously contained any confidential information belonging to Noble;

   3.  Requiring Hurd to immediately make available for forensic imaging and examination by an independent third-party consultant any computer(s), cell phone(s), tablet(s), e-mail account, cloud-based service account, or other devices Hurd has used to perform work on behalf of Safeware;

   4.  Requiring Hurd to immediately make available for forensic imaging and examination by an independent third-party consultant any external storage devices she connected to her Noble-owned devices;

   5.  Requiring Hurd to immediately provide her password to her Yahoo account at carandtov@yahoo.com and any cloud-based storage account so that an

independent third-party consultant can run searches to determine if this email address received Noble information and forwarded this information to Safeware or other third parties;

6. Following the forensic examination and preservation of Hurd's devices, requiring her to immediately destroy all proprietary and any other confidential information belonging to Noble in her custody, possession and control;

7. Requiring Hurd to identify any proprietary and confidential information she has shared with Safeware, and cease the use of all Noble proprietary and confidential information on behalf of Safeware or any other person or entity;

8. Enjoining Hurd from the continued use of Noble's proprietary and confidential information and requiring that she cease participation in the sale and/or distribution of all products or services developed by her new employer relying upon Noble's proprietary and confidential information;

9. Enjoining Hurd from any attempts to use or otherwise profit from Noble's proprietary and confidential information; and

10. Enjoining Hurd from otherwise violating her restrictive covenant obligations under the Restrictive Covenant Agreement.

D. That Noble be awarded its costs and expenses, including attorneys' fees to the extent permitted by law;

E. That the Court award Noble such additional relief as the Court deems just and proper.

## **<u>REQUEST FOR JURY TRIAL</u>**

Plaintiff respectfully requests a trial by jury.

24

Respectfully submitted,

/s/ Adam T. Simons
Adam T. Simons (Fed. Bar No. 29357)
**McGuireWoods LLP**
500 East Pratt Street, Suite 1000
Baltimore, Maryland 21202
(410) 659-4400 (phone)
(410) 659-4599 (fax)
asimons@mcguirewoods.com

Peter N. Farley (*pro hac vice* forthcoming)
Daniel P. Peyton, Esq. (*pro hac vice* forthcoming)
**McGuireWoods LLP**
Gateway Plaza
800 East Canal Street
Richmond, Virginia 23219
(804) 775-1000
(804) 775-1061 (Facsimile)
pfarley@mcguirewoods.com
dppeyton@mcguirewoods.com
*Attorneys for Noble Supply & Logistics*

## **<u>VERIFICATION</u>**

I, Stacy Williamson, am a duly authorized representative of Noble Supply & Logistics, LLC ("Plaintiff").  I hereby state that I have read the foregoing Verified Complaint and that the statements set forth therein are true as I believe based on my personal knowledge and information supplied to me by Plaintiff's employees and agents and through records kept by Plaintiff in the ordinary course of business.  I understand that false statements herein are subject to the penalties of 28 U.S.C. § 1746 relating to sworn declarations.

Executed on this 25th day of May, 2023.

DocuSigned by:

D05AD59CA4EB400...

Stacy Williamson
Chief People Officer